UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Clifford Majors, Jr.,                                        Case No. 3:23-cv-2184

           Plaintiff,

v.                                                     MEMORANDUM OPINION
                                                         AND ORDER

General Dynamics Land Systems, Inc.,

           Defendant.

## I. INTRODUCTION

Defendant General Dynamics Land Systems has filed a motion to dismiss Plaintiff Clifford Majors, Jr.'s complaint in its entirety under Rule 12(b)(6). (Doc. No. 5). Majors filed a brief in opposition, (Doc. No. 6), and GDLS filed a brief in reply. (Doc. No. 7). In addition, Majors filed a motion for leave to file a sur-reply, (Doc. No. 8), which GDLS opposed. (Doc. No. 9). For the reasons stated below, I grant GDLS's motion to dismiss in part and deny it in part. I also deny Majors's motion for leave to file a sur-reply.

## II. BACKGROUND

GDLS hired Majors in October of 2019 as a mechanical engineer. (Doc. No. 1-3 at 4). Majors is African American. (*Id.*) He had degenerative disc disease when he was hired. (*Id.* at 5).

In August of 2020, a Caucasian colleague accused Majors of violating company policy by taking photos of the inside of the GDLS facility with his phone. (*Id.* at 6). Major was cleared of any wrongdoing, but he alleges his supervisors and GDLS management—all of whom are Caucasian—began singling him out for scrutiny from then on. (*Id.* at 7).

Majors contends GDLS selectively disciplined him for failing to consistently fill out his timecards even though his Caucasian coworkers engaged in the same behavior and were not punished. (*Id.*). Specifically, in October of 2020, Majors was reprimanded by his manager, Thomas Heckman, for not filling out his timecards and for producing inferior work product. (*Id.* at 8). Majors also alleges a Caucasian coworker, Blake Lamb, demeaned him and talked down to him, behavior Lamb never directed at any Caucasian coworkers. (*Id.*). Majors reported this to GDLS, but GDLS allegedly ignored him. (*Id.*).

In February of 2021, Majors contracted a severe case of COVID-19 and requested time off, submitting a doctor's note in support. (*Id.* at 9-10). On June 1, 2021, after Majors returned to work, GDLS summoned him to a disciplinary meeting, where a human resources employee named Donna Kelly accused Majors of lying about having COVID-19 and rejected Majors's doctor's note because it contained the wrong "verbiage." (*Id.* at 11-12). At the end of this meeting, Kelly suspended Majors for 30 days. (*Id.*). GDLS lifted the suspension after Majors procured an updated doctor's note. (*Id.*).

According to Majors, the stress of this incident aggravated his degenerative disc disease and caused painful migraines. (*Id.* at 12-13). So, Majors asked for intermittent time off to deal with these flare-ups. (*Id.* at 13). Majors alleges he qualified for FMLA leave at this time, but he did not know he qualified for FMLA leave, and GDLS did not tell him. (*Id.*). When Majors took this time off anyway, GDLS disciplined him for it. (*Id.*). Later, one of the few other non-Caucasian employees at GDLS, Harvey Carter, told Majors about intermittent FMLA leave, and when Majors specifically asked to take intermittent FMLA leave to deal with his migraines, GDLS granted that request. (*Id.*).

GDLS limited Majors's intermittent FMLA leave to two days per month. (*Id.* at 14). When Majors took intermittent FMLA leave on August 8 and 9 of 2021, GDLS attempted to discipline

2

him for it, though it backed down after Majors showed he was legitimately using FMLA leave. (*Id.* at 14). Subsequently, Majors contends GDLS management began freely sharing Majors's private health information with other employees, which facilitated further harassment he suffered at the hands of his coworkers. (*Id.*). One such coworker, James McNulty, allegedly disclosed Majors's health information to a third-party vendor on September 28, 2021, so Majors confronted him about it on September 30, 2021, two days later. (*Id.* at 14-15). That same day, McNulty, who is Caucasian, told another employee, "If that would've happened in my day, we would have been tied him up, took him out, and gutted him." (*Id.* at 15). To Majors, this was an overt threat to lynch him. (*Id.*).

Majors learned about this threat the day McNulty made it, and he reported it to GDLS immediately. (*Id.* at 15). But Majors contends GDLS did not conduct an investigation or take sufficient corrective action against McNulty. (*Id.* at 15-17). Instead, on September 30, 2021—the same day Majors reported the threat, and the same day McNulty made it—GDLS suspended Majors, allegedly in retaliation for his report. (*Id.* at 17). GDLS purported to take this action because Majors missed work to take his son to the doctor without using FMLA leave. (*Id.* at 17). Majors asserts he was forced to do so by GDLS's own policy restricting his use of intermittent FMLA leave to two days per month. (*Id.* at 17). GDLS's mistreatment of Majors allegedly caused him to develop PTSD. (*Id.* at 18.). As a result, Majors took long-term disability leave. (*Id.* at 18).

On October 27, 2021, Majors filed an administrative complaint with the Ohio Civil Rights Commission. (Doc. No. 5-1 at 4). He checked boxes indicating he was discriminated against on the basis of "Race/Color," "Age (Over 40 only)," and "Retaliation (for protesting discrimination)." (*Id.* at 2). To describe "how [he was] a member of the group[s] marked above," Majors wrote, "Black male DOB: 10/08/1979 with medical conditions." (*Id.*). He indicated he was subjected to "Denial of a reasonable accommodation," "Harassment (including sexual harassment)," "Different terms

3

and conditions of employment," "Layoff/Denial of recall," and "Discipline (write-up, suspension, etc.)." (*Id.* at 3). In his narrative, he states:

> It has been at least fourteen months where I have endured racist comments, unfair treatment, disciplinary action, slights, even threats in a hostile workplace run by General Dynamics. A workplace where my coworker (James McNulty Plant/Mechanical Engineer) recently stated out loud "back in the day we would beat em' up, then take em' outside and gut them," referencing me, and he was suspended for this action and I was never notified of this threat formally by corporate or local HR, my direct and/or indirect supervisor(s) Thomas Heckman & Thomas Stevenson, or my union steward (Sonny Oakley), I was informed by a Union mediator (Arvee Carter). General Dynamics, a place where white supervisors and managers turned a blind eye to a coworker sharing my private health information with a vendor outside of the company, when my supervisor (Thomas Heckman) was provided this information he responded saying, "I don't see a problem with it," as in response to the underlying violent racial hate and bullying I have experienced. On April 14, 2020, a notice of harassment was filed by my wife with Krisha Jelinski (corporate HR), due to me fearing retaliation, and nothing has been done.

(*Id.*).

On October 5, 2023, Majors sued GDLS in the Lucas County Court of Common Pleas. (Doc. No. 1-3 at 3). His complaint contains 7 counts: disability discrimination in employment under Ohio law (Count I), race discrimination in employment under Ohio law (Count II), hostile work environment based on disability under Ohio law (Count III), retaliation under Ohio law for complaining about race discrimination and for complaining about disability discrimination (Count IV), failure to accommodate a disability under Ohio law (Count V), FMLA interference (Count VII), and FMLA retaliation (Count VIII).[1] GDLS received a summons and copy of the complaint on October 12, 2023. (Doc. No. 1-4 at 41). It timely removed the action to this court on November 8, 2023, 27 days later. (Doc. No. 1); *see* 28 U.S.C. § 1446(b).

---

[1] Although the final Count in Majors's complaint is styled as "Count VIII," it is the seventh listed cause of action, not the eighth. There is no "Count VI." (*See* Doc. No. 1-3 at 18-23). Majors's complaint contains "Count I," "Count II," "Count III," "Count IV," "Count V," "Count VII," and "Count VIII." (*See id.*).

4

### III. STANDARD

Rule 12 provides for the dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court must accept as true all of the factual allegations contained in the complaint when ruling on a motion to dismiss. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). To survive a motion to dismiss under Rule 12(b)(6), "even though a complaint need not contain 'detailed' factual allegations, its 'factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal citations and quotation marks omitted)).

The plaintiff must offer more than conclusory allegations or legal conclusions masquerading as factual allegations. *Twombly*, 550 U.S. at 555 (The complaint must contain something more than "a formulaic recitation of the elements of a cause of action."). A complaint must state sufficient facts which, when accepted as true, state a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" and requires the complaint to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct).

Courts must read Rule 12(b)(6) in conjunction with Rule 8(a)(2)'s requirement that a plaintiff need offer "only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555); *see also Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008). The court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case[,] and exhibits attached to defendant's motion to dismiss so

5

long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### IV. ANALYSIS

#### A. MOTION TO DISMISS

GDLS moves to dismiss all of Majors's claims. (Doc. No. 5 at 7). Majors argues each of his claims is plausible. (Doc. No. 6 at 15).

##### 1. DISABILITY-RELATED CLAIMS (COUNTS I, III, IV, AND V)

GDLS argues Majors's disability-related claims—Counts I, III and V, and the disability-related retaliation claim in Count IV—should be dismissed because they are not included in Majors's OCRC charge. (Doc. No. 5 at 7-9). Majors argues he has exhausted his administrative remedies because his administrative complaint, taken as a whole, encompasses all his disability-related claims. (Doc. No. 6 at 6-8). GDLS attached a copy of Majors's administrative complaint to its motion to dismiss, which I may consider because it is "referred to in the Complaint and [is] central to the claims contained therein." *Bassett*, 528 F.3d at 430; (*see* Doc. No. 1-3 at 4).

A plaintiff must "exhaust administrative remedies existing under Ohio law" before bringing a lawsuit under Ohio Revised Code § 4112.02. *Burch v. Farmers Ins. Co.*, 211 N.E.3d 202, 204 (Ohio App. 2023). To do so, they must (1) file a charge with the Ohio Civil Rights Commission and (2) receive a notice of right to sue from the OCRC, request a notice of right to sue and allow 45 days to elapse with no response, or receive a notice that discrimination probably occurred and inform the OCRC they will file a lawsuit. *Glenn v. Trumbull Cnty. Comm'rs*, No. 2023-T-0067, 2024 WL 1254696 at *8 (Ohio Ct. App. March 25, 2024) (citing Ohio Rev. C. § 4112.052(B)(1)).

"Only claims that are included in the charge or are 'reasonably related to or grow out of the factual allegations in the [administrative] charge' may be heard" in court. *Russ v. Memphis Light Gas Water Div.*, 720 F. App'x 229, 236 (6th Cir. 2017) (quoting *Younis v. Pinnacle Airlines*, 610 F.3d 359,

6

361-62 (6th Cir. 2010)).[2] If the administrative charge does not expressly identify a particular claim, a plaintiff can satisfy the exhaustion requirement if the charge "alleges sufficient facts . . . to put the [agency] on notice of the other claim" notwithstanding a failure to "check the appropriate box." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010). Courts "construe[] liberally" a charge filed by a complainant who was *pro se* at the administrative stage. *Younis*, 610 F.3d at 362. Drawing reasonable inferences from the pleadings in Majors's favor, I will assume, for purposes of this opinion, that Majors filed his administrative charge without the assistance of counsel. (*See* Doc. No. 1-3 at 4; Doc. No. 5-1 at 2).

### a.  Failure to Accommodate Claim (Count V)

Majors's complaint alleges GDLS failed to engage in the interactive process and failed to provide him a reasonable accommodation for his disability. (Doc. No. 1-3 at 21-22). Majors checked the box next to "Denial of a reasonable accommodation," and he indicated his membership in a protected class by stating he has "medical conditions." (Doc. No. 5-1 at 2-3). While a person's "medical conditions" may or may not qualify as a disability, the OCRC charge form instructs complainants not to identify their disability or medical conditions, so this level of generality is consistent with the OCRC's expectations for disability-based claims. (*See* Doc. No. 5-1 at 2). Taken together, these aspects of the charge are sufficient to provide notice that Majors alleged the denial of a reasonable accommodation on the basis of a disability. *See Rhea v. Dollar Tree Stores, Inc.*, 395 F.

---

[2] "[T]here is sparse case law interpreting" Ohio's relatively new administrative exhaustion requirement for employment discrimination claims. *Glenn*, 2024 WL 1254696 at *9. In *Glenn*, the court looked to federal law interpreting Title VII's administrative exhaustion requirement in applying § 4112.052(B)(1)'s parallel requirement. *See id.* at *9-10 (noting "federal case law interpreting Title VII . . . is generally applicable" to Ohio employment discrimination claims) (quoting *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981) (internal citations and quotation marks omitted)). Because Ohio courts generally apply federal employment discrimination law to employment discrimination claims brought under § 4112.02, and because the parties do not argue otherwise, I apply federal administrative exhaustion case law here. (*See* Doc. No. 5 at 8 n.4; Doc. No. 6 at 7-8).

7

Supp. 2d 696, 704 (W.D. Tenn. 2005) (finding the plaintiffs exhausted administrative remedies for their claim of sex stereotyping where they "checked off that they were discriminated against on the basis of sex" on their EEOC forms). "Constru[ed] liberally," this is sufficient to meet the exhaustion requirement in § 4112.052(B)(1). *Younis*, 610 F.3d at 362.

### b. Disability-related Retaliation Claim (Count IV)

Majors's complaint alleges GDLS retaliated against him after he "complained about the perceived disability discrimination he was experiencing." (Doc. No. 1-3 at 21). Majors's charge indicates he was discriminated against on the basis of "Retaliation (for protesting discrimination)." (Doc. No. 5-1 at 2). He invokes four protected traits in his administrative charge: race ("Black"), sex ("Male"), age ("DOB 10/08/1979"), and disability ("medical conditions"). (Doc. No. 5-1 at 2); *see* Ohio Rev. C. § 4112.02(A). So, unlike the failure to accommodate claim, the combination of checked boxes does not, by itself, indicate what sort of discrimination Majors alleges he was retaliated against for protesting.

The narrative portion of the OCRC charge focuses on race-related discrimination: it notes the race of Majors's supervisors, discusses "racist comments," including the alleged death threat, and describes "violent racial hate and bullying." (Doc. No. 5-1 at 3). But the charge also asserts Majors's supervisor, Thomas Heckman, responded dismissively when he learned one of Majors's coworkers disclosed Majors's private health information to a third party. (*See id.*). And the charge alleges Majors "fear[ed] retaliation" after his wife filed a complaint on his behalf with GDLS's Human Resources department. (*Id.*).

Construed liberally, the assertion of retaliation, the invocation of "disability" as a protected class, and the suggestion Majors's supervisor sanctioned the unwanted disclosure of Majors's private health information after Majors's wife filed a complaint with GDLS's human resources department "sets forth sufficient facts to put the [OCRC] on notice of Plaintiff's retaliation claim" based on a

8

complaint of disability discrimination. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010) (plaintiff properly exhausted retaliation claim where he failed to check the "retaliation" box but asserted his supervisor had a "personal vendetta" against him). I find Majors properly exhausted this claim.

### c. Disability-based Disparate Treatment Claim (Count I)

Majors's complaint alleges GDLS "took adverse employment actions against Majors based on Majors's disability" and "engaged in disparate treatment based on Majors'[s] disability." (Doc. No. 1-3 at 19). Majors's charge indicates he suffered "Different terms and conditions of employment," "Layoff/Denial of recall," and "Discipline (write-up, suspension, etc[.])," and, as explained above, it invokes the protected traits of race, sex, age, and disability. (Doc. No. 5-1 at 2-3).

But while the OCRC charge's narrative alleges facts that would prompt an investigation of retaliation based on a complaint of disability discrimination, it does not allege facts that would prompt the investigation of a disability-based disparate treatment claim. Such a claim requires a plaintiff to show his employer took an adverse employment action against him because of his disability. *Hall v. Crawford Cnty. Job and Fam. Servs.*, 188 N.E.2d 1138, 1144 (Ohio Ct. App. 2022). An adverse employment action is "a materially adverse change in the terms and conditions of the plaintiff's employment." *Moody v. Ohio Dep't of Health and Addiction Servs.*, 183 N.E.2d 21, 33 (Ohio Ct. App. 2021).

The OCRC charge does not suggest GDLS took any such action against Majors because of his disability. Instead, the narrative focuses on an "atmosphere of violent *racial* hate and bullying," including an alleged racist death threat and the actions of a "white supervisor." (*Id.*) (emphasis added). And while the charge asserts this supervisor tolerated the unwanted disclosure of Majors's private health information, Majors does not attempt to explain how this behavior could qualify as an

9

adverse employment action taken because of Majors's disability in violation of Ohio law. (*See* Doc. No. 6 at 7-8); *cf. Moody*, 183 N.E.3d at 33 (Ohio 2021) (employee's three-day working suspension, where he did not lose any wages or seniority, was not an adverse employment action under Ohio law). Taken as a whole, the charge would not put the OCRC on notice of a potential disability-based disparate treatment claim. Majors has failed to exhaust his administrative remedies for the claim in Count I.

### d. Disability-based Hostile Work Environment Claim (Count III)

Finally, Majors's complaint alleges GDLS "created a hostile work environment based on Majors's disability." (Doc. No. 1-3 at 20). Majors checked the box appropriate for this claim on his OCRC charge: "Harassment (including sexual harassment)." (Doc. No. 5-1 at 3). But severe and pervasive harassment based on any of the four protected traits Majors invoked in his OCRC charge can give rise to a claim for a hostile work environment under Ohio law. *See, e.g.*, *Rice v. Cuyahoga Cnty. Dept. of Justice*, 970 N.E.2d 470, 478 (Ohio Ct. App. 2005) (race); *Fry v. Wheatland Tube, LLC*, 135 N.E.3d 420, 433 (Ohio Ct. App. 2019) (sex); *Nemcek v. Northeast Ohio Reg'l Sewer Dist.*, No. 98431, 2012 WL 5987562 at *1 (Ohio Ct. App. Nov. 29, 2012) (age); *Corrado v. Warren-Trumbull Cnty. Pub. Libr.*, No. 2005–T–0120, 2006 WL 2589811 at *7 (Ohio Ct. App. Sept. 8, 2006) (disability). The narrative portion of the OCRC charge notes the race of Majors's supervisors, discusses "racist comments," including the alleged death threat, and describes "violent racial hate and bullying." (Doc. No. 5-1 at 3). It does not discuss harassment based on Majors's "medical conditions." (*See id.*).

Majors points to the portion of the OCRC narrative alleging "white supervisors and managers turned a blind eye to a coworker sharing my private health information with a vendor outside of the company." (*Id.*; *see* Doc. No. 6 at 8). But even if this amounts to a discriminatory act, "inclusion in an [administrative] charge of discrete acts of discrimination to support a claim of

10

disparate treatment cannot, standing alone, support 'a subsequent, uncharged claim of hostile work environment unless the allegations in the complaint can be reasonably inferred from the facts alleged in the claim.'" *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 627 (6th Cir. 2013) (quoting *Younis*, 610 F.3d at 362).

The complaint asserts Majors endured a hostile work environment because of his disability. (Doc. No. 1-3 at 20). But at most, the OCRC charge alleges a "one-time occurrence" of discriminatory conduct based on a disability, which is "a far cry from the 'severe or pervasive' standard" a plaintiff must meet to succeed on a hostile work environment claim. *Kuhn*, 709 F.3d at 327. Given the charge narrative's overall focus on racist comments and bullying, the isolated allegation about the disclosure of Majors's private health information would not put the OCRC on notice they ought to investigate whether Majors endured a hostile work environment based on his disability. *See Cooper v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 950-51 (W.D. Tenn. 2010) (explaining that a charge of discrimination on the basis of one protected class, like sex, "is not the type that would be expected to reasonably grow out of" a charge of discrimination on the basis of a different protected class, like race). Because the scope of Majors's OCRC charge does not include a disability-based hostile work environment claim, he has failed to exhaust the claim in Count III.

e. Conclusion

I find Majors has failed to exhaust his disability-based hostile work environment claim (Count III) and disability-based disparate treatment claim (Count I), so I grant GDLS's motion to dismiss as to those claims. (*See* Doc. No. 5 at 7-9). But because Majors has properly exhausted his disability-related retaliation claim (Count IV) and failure-to-accommodate claim (Count V), I deny GDLS's motion to dismiss as to those claims. (*See id.*).

### 2. FMLA CLAIMS (COUNTS VII AND VIII)

GDLS argues Majors's FMLA interference and retaliation claims are untimely because the most recent adverse employment action asserted as a basis for each claim occurred more than 2 years before Majors filed this lawsuit, and Majors cannot take advantage of the FMLA's 3-year statute of limitations for willful violations. (Doc. No. 5 at 9-11). Majors argues his FMLA claims are timely under the two-year period because his September 30, 2021 suspension is ongoing or, alternatively, that his claims are subject to the 3-year limitations period because the September 30, 2021 suspension was willful. (Doc. No. 6 at 9-10).

Ordinarily, a plaintiff must bring an FMLA claim "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). For a willful violation of the FMLA, a plaintiff must bring a claim "within 3 years of the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(2).

Before turning to the question of willfulness, I address Majors's argument that his FMLA claims would be timely under the 2-year statute of limitations. An FMLA claim accrues "when the plaintiff learn[ed] of the employment decision itself." *Amini v. Oberlin Coll.*, 259 F.3d 493, 498–99 (6th Cir. 2001); *see Ruiz-Fane v. Tharp*, 545 F. Supp. 3d 543, 560 n.6 (N.D. Ohio 2021) (applying this principle to an FMLA interference claim). As relevant here, a suspension becomes actionable when the suspension decision is communicated to the employee. *See Mayers v. Campbell*, 87 F. App'x 467, 471 (6th Cir. 2003). GDLS suspended Majors on September 30, 2021, and Majors learned of the decision "immediately." (Doc. No. 1-3 at 15-17). Majors filed his lawsuit on October 5, 2023, more than two years later. (*See* Doc. No. 1-3).

While Majors's claim accrued outside of the two-year filing window for non-willful FMLA violations, the September 30, 2021 suspension would fall within the three-year filing period for

12

willful violations. The timeliness of Majors's FMLA claims thus turns on whether Majors has sufficiently pled GDLS willfully violated the FMLA.

"[T]he central inquiry in determining whether a violation of the FMLA is willful is 'whether the employer intentionally or recklessly violated the FMLA.'" *Crugher v. Prelesnick*, 761 F.3d 610, 617 (6th Cir. 2014) (quoting *Hoffman v. Pro. Med Team*, 394 F.3d 414, 417 (6th Cir. 2005)). At the pleading stage, "[a] plaintiff 'must do more than make the conclusory assertion that a defendant acted willfully.'" *Crugher*, 761 F.3d at 617 (quoting *Katoula v. Detroit Ent., LLC*, 557 F. App'x. 496, 498 (6th Cir. 2014)). Instead, he must "plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation 'plausible on its face.'" *Crugher*, 761 F.3d at 617 (quoting *Katoula*, 557 F. App'x. at 498) (internal citation and quotation marks omitted). Still, "conditions of a person's mind may be alleged generally" as long as the complaint contains facts supporting those allegations. *Id.*

I conclude Majors has not sufficiently pled that GDLS willfully violated the FMLA. Majors argues only that the September 30, 2021 suspension is a willful FMLA violation. (*See* Doc. No. 6 at 9-10). But the complaint's description of this incident does not allow the inference GDLS willfully interfered with Majors's FMLA rights, or retaliated against him for invoking those rights, when it suspended him that day. To start, the complaint alleges Majors's report about a racist incident, rather than the time he took off work to take his son to a doctor's appointment, was the real reason GDLS suspended him. (*See* Doc. No. 1-3 at 15-17). And even assuming GDLS told Majors he was being suspended for failing to properly use his FMLA leave when taking his son to a doctor's appointment, Majors does not explain how this adds up to "intentionally or recklessly violat[ing] the FMLA." *Crugher*, 761 F.3d at 617 (further citation omitted); (*see* Doc. No. 6 at 9-10).

Beyond this, the complaint alleges, at most, that the September 30, 2021 suspension arose from GDLS's failure "to properly advise[]" Majors of the precise contours of his FMLA leave. (*Id.*

13

at 17, 22). Even if this is true, Majors does not explain how it could amount to a willful, rather than a "merely negligent," violation of the FMLA. *Coffman v. Ford Motor Co.*, 719 F. Supp. 2d 856, 868 (S.D. Ohio 2010). *See also Hensler v. Quality Temporary Servs., Inc.*, No. 16-cv-11210, 2016 WL 3137820 at *3-4 (E.D. Mich. June 6, 2016) (finding the plaintiff did not allege willfulness where the defendant allegedly failed to inquire about whether the plaintiff's condition was FMLA-qualifying and failed to provide the plaintiff with a notice of FMLA rights and responsibilities).

Rather than grapple with these issues, Majors argues GDLS has misconstrued the pleading standard he is required to meet. He quotes *Ricco v. Potter*, 377 F.3d 599 (6th Cir. 2004), for the proposition, "a plaintiff may withstand [a motion to dismiss] merely by having alleged that the FMLA violation was willful" and further notes that failure to adhere to a statute of limitations is an affirmative defense. (Doc. No. 6 at 9-10). But the Sixth Circuit expressly rejected the statement from *Ricco* because "*Ricco* predated *Iqbal* and *Twombly*." *Crugher*, 761 F.3d at 617 n.9. And a court may dismiss a claim as untimely where "the allegations in the complaint affirmatively show that the claim is time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). The allegations in the complaint affirmatively show Majors's FMLA interference and retaliation claims fall outside the 2-year statute of limitations and do not qualify for the 3-year statute of limitations. Therefore, I grant GDLS's motion to dismiss with respect to Count VII and Count VIII. (Doc. No. 5 at 10-11).

### 3. RACE-BASED DISPARATE TREATMENT AND RACE-RELATED RETALIATION CLAIMS (COUNTS II AND IV)

GDLS argues Majors has failed to state claims for race-based employment discrimination (Count II) or retaliation (Count IV) under Ohio law. (Doc. No. 5 at 11-15). Majors argues he has adequately pled both claims. (Doc. No. 6 at 11-14). I apply the law of Title VII to evaluate these arguments because "federal case law interpreting Title VII . . . is generally applicable" to Ohio employment discrimination claims. *Plumbers & Steamfitters Joint Apprenticeship Comm.*, 421 N.E.2d at 131 (internal citations and quotation marks omitted).

14

### a. Race-based Disparate Treatment Claim (Count II)

Ohio law makes it unlawful "to discriminate against [a] person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment" on the basis of several protected characteristics, including "race." Ohio Rev. C. § 4112.02(A).

To adequately plead a claim under this statute, "an employee must demonstrate that an adverse employment action was causally linked to discriminatory intent. The ultimate inquiry is 'whether the defendant intentionally discriminated against the plaintiff.'" *Martin v. Block Comms., Inc.*, No. L–16–1213, 2017 WL 1422889 at *5 (Ohio Ct. App. April 21, 2017) (quoting *USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). "An adverse employment action is 'a materially adverse change in the terms and conditions of [a plaintiff's] employment.'" *Redlin v. Grosse Pointe Public Sch. Sys.*, 921 F.3d 599, 607 (6th Cir. 2019) (quoting *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010)) (further citation omitted); *accord Moody v. Ohio Dep't of Mental Health and Addiction Servs.*, 183 N.E.2d 21, 33 (Ohio Ct. App. 2021). This includes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Redlin*, 921 F.3d at 607 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008)) (quotation marks and further citation omitted).

GDLS argues Majors has failed to plead he suffered an adverse employment action because of his race. (Doc. No. 5 at 11-13). Majors points to three sets of circumstances as potential adverse employment actions: the "discipline" he received for failing to consistently fill out his time cards, the September 30, 2021 suspension, and the "hostile work environment" Majors attributes to his mistreatment by coworkers and supervisors. (Doc. No. 6 at 12-13).

15

First, Majors contends he was "disciplined for an alleged failure to fill out timecards while Caucasian comparators were not disciplined." (Doc. No. 6 at 12). But the only disciplinary incident Majors identifies in his complaint related to the time-card issue is a meeting with his supervisor in October of 2020 where he was "accused . . . of attendance issues and inferior work." (Doc. No. 1-3 at 8). But a reprimand, "without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012). None of the allegations in Majors's complaint permit a reasonable inference that the October 2020 reprimand led to a materially adverse consequence. Therefore, this incident cannot serve as a basis for Majors's race discrimination claim in Count II.

Next, Majors argues the "context and timing" of his September 30, 2021 suspension makes it plausible GDLS suspended him because of his race. (Doc. No. 6 at 13). He contends "the combination of the hostile work environment and previous disparate treatment show that the suspension was partially motivated by race." (*Id.*). But in making this argument, Majors does not discuss any specific allegations in his complaint, and he does not cite any law in support of this argument. (*See id.*). Setting aside the complaint's general legal conclusions—which I may not credit when deciding a Rule 12(b)(6) motion—Majors does not explain why it is plausible GDLS suspended him on September 30, 2021 because of his race. *See Twombly*, 550 U.S. at 555.

Majors suggests the allegation GDLS suspended him shortly after he reported McNulty's threat supports his causal argument. Here, though, this is "relevant to the plaintiff's retaliation claim[], . . . but not to [his] discrimination claim[]." *Beny v. Univ. of Mich. Bd. of Regents*, No. 22-12021, 2023 WL 4409107 at *9 (E.D. Mich. July 7, 2023). While Majors has alleged he was suspended because he reported McNulty's threat, he has not identified any allegations that could yield an inference he was suspended because of his race. So, this adverse action does not support Majors's

16

race discrimination claim. *See id.* at *9-10. (dismissing sex and race discrimination claims because of a lack of a causal connection to the plaintiff's suspension but allowing her retaliation claim, based on that same suspension, to proceed).

Finally, Majors argues he "adequately pled that he suffered a hostile work environment on the basis of race." (Doc. No. 6 at 13). But Count II does not allege a race-based hostile work environment claim. Instead, it alleges a "disparate treatment" claim based on "adverse employment actions" GDLS took against Majors. (Doc. No. 1-3 at 19-20). A hostile work environment claim based on a protected characteristic is a distinct type of claim. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (holding that "a claim of 'hostile environment' sex discrimination is actionable under Title VII"); *accord Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 734 (Ohio 2000) (observing that "since no tangible employment action was taken in this case, appellant's claim is based on the creation of a hostile working environment"). The allegations related to Majors's work environment do not themselves constitute the kind of adverse employment action cognizable as part of the disparate treatment claim alleged in Count II. *See Berryman v. SuperValu Holdings, Inc.*, No. 3:05-cv-169, 2010 WL 1257851 at *7 n.8 (S.D. Ohio March 31, 2010) (explaining that the plaintiff's argument about "the casual attitude of the supervisors toward the alleged racial harassment . . . is not applicable to a disparate treatment claim").

Because Majors has failed to plead he suffered an adverse employment action on the basis of race, I grant GDLS's motion to dismiss the disparate treatment claim in Count II of the complaint. (Doc. No. 5 at 12-13).

        **b.**      **Race-related Retaliation Claim (Count IV)**

Ohio law prohibits a person from "discriminat[ing] in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section." Ohio Rev. C. § 4112.02(I). To establish a prima facie case of retaliation, a plaintiff must show: "(1) . . . he

17

engaged in a protected labor activity under Ohio or federal law, (2) . . . his engagement in protected activities was known to the defendant, (3) defendant took an employment action adverse to plaintiff . . ., and (4) there was a causal connection between the protected activity and the adverse employment action." *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998) (internal citations omitted).

GDLS argues Majors has not pled he engaged in "protected activity" and that there is no plausible causal connection between protected activity and any adverse action in the complaint. (*Id.* at 13-15). I reject both arguments.

First, a "complaint of coworker harassment" can qualify as protected activity under Ohio law as long as the plaintiff has "an objectively reasonable and good faith belief" that the coworker's conduct is unlawful. *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016). Race-based threats of physical violence can create a hostile work environment. *See Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999). And learning of such a threat second-hand can contribute to a hostile work environment. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999).

Here, Majors alleges he perceived McNulty's statement as a threat to "lynch" him, and he reported that threat to GDLS. (*See* Doc. No. 1-3 at 15). Crediting the allegations in the complaint, I find Majors has adequately alleged his report of McNulty's threat was protected activity because he reported what he reasonably believed was a coworker's racially-motivated threat of violence towards him.

Second, Majors has sufficiently pled a causal connection between this protected activity and his suspension. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Majors alleges

GDLS suspended him on September 30, 2021, "immediately" after he reported McNulty's threat that same day. (Doc. No. 1-3 at 17). At the pleading stage, this is enough to make it plausible that GDLS suspended Majors because he reported McNulty's threat. *See Brown v. RCO Engineering Inc.*, No. 23-11371, 2024 WL 1019258 at *5 (E.D. Mich. March 8, 2024) (denying a motion to dismiss a retaliation claim where the plaintiff was fired two days after engaging in protected activity).

I deny GDLS's motion to dismiss Majors's retaliation claim (Count IV). (Doc. No. 5 at 13-15).

### B.   MOTION FOR LEAVE TO FILE A SUR-REPLY

Majors moves for leave to file a one-paragraph sur-reply, arguing I should consider GDLS's supposed concession in its briefing that it "suspended the Plaintiff for a period of time extending to at least October 6, 2021." (Doc. No. 8 at 1). GDLS opposes this motion. (*See* Doc. No. 9).

Neither the Federal Rules of Civil Procedure nor the Local Civil Rules expressly address whether and under what circumstances a sur-reply brief may be appropriate. But "sur-replies . . . are highly disfavored," and whether to permit one is "left to the broad discretion of the trial court." *Carter v. Paschall Truck Lines, Inc.*, 364 F. Supp. 3d 732, 748 (W.D. Ky. 2019) (internal citations and quotation marks omitted). Courts often consider whether the party seeking to file the sur-reply brief has shown good cause, such as the need to address a legal issue or evidence that was raised for the first time in a reply brief. *See, e.g., Key v. Shelby Cnty.*, 551 F. App'x 262, 264-65 (6th Cir. 2014); *Geiger v. Pfizer, Inc.*, 271 F.R.D. 577, 580-81 (S.D. Ohio 2010).

GDLS asserts, in its reply brief, that Majors's September 30, 2021 suspension ended on October 29, 2021. (Doc. No. 7 at 6). Majors argues this conclusively establishes his claims are timely, since he filed this lawsuit on October 5, 2023, less than two years after the supposed end of the September 30 suspension. (Doc. No. 8). But I have already explained above that Majors's FMLA claims—the only claims GDLS seeks to dismiss on timeliness grounds—accrued on

19

September 30, 2021, when GDLS communicated the suspension decision to Majors. For timeliness purposes, it does not matter when Majors's suspension ended. *See Mayers*, 87 F. App'x at 471. Accordingly, because Majors has not pointed to any "new reasons and evidence" in GDLS's reply brief that might require me to give him "an opportunity to respond," I deny the motion for leave to file a sur-reply. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481-82 (6th Cir. 2003).

## V. CONCLUSION

For the reasons stated above, I grant GDLS's motion to dismiss in part and deny it in part. (Doc. No. 5). I deny Majors's motion for leave to file a sur-reply. (Doc. No. 8). At this stage of the case, the following claims remain: the Ohio law disability-based hostile work environment claim in Count III, the Ohio law retaliation claims in Count IV, and the Ohio law disability-based failure to accommodate claim in Count V. The Ohio law disability discrimination claim in Count I, the Ohio law race discrimination claim in Count II, the FMLA interference claim in Count VII, and the FMLA retaliation claim in Count VIII are dismissed.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge